*102 KAVANAUGH, Circuit Judge,
with whom Circuit Judges HENDERSON, BROWN, and GRIFFITH join,
dissenting from the denial of rehearing en banc:
in a series of recent qualified immunity cases, the Supreme Court has repeatedly told the courts of appeals that police officers may not be held liable for damages unless the officers were “plainly incompetent” or “knowingly violate[d]” clearly established law. Carroll v. Carman, — U.S. —, 135 S.Ct. 348, 350, 190 L.Ed.2d 311 (2014) (internal quotation marks omitted). The Supreme Court “often corrects lower courts when they wrongly subject individual officers to liability.” City & County of San Francisco v. Sheehan, — U.S. —, 135 S.Ct. 1765, 1774 n. 3, 191 L.Ed.2d 856 (2015). Indeed, in just the past five years, the Supreme Court hás issued 11 decisions reversing federal courts of appeals in qualified immunity cases, including five strongly worded summary reversals. See Mullenix v. Luna, — U.S. —, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (summary reversal); Taylor v. Barkes, — U.S. —, 135 S.Ct. 2042, 192 L.Ed.2d 78 (2015) (summary reversal); Sheehan, 135 S.Ct. 1765; Carroll, 135 S.Ct. 348 (summary reversal); Plumhoff v. Rickard, — U.S. —, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014); Wood v. Moss, — U.S. —, 134 S.Ct. 2056, 188 L.Ed.2d 1039 (2014); Stanton v. Sims, — U.S. —, 134 S.Ct. 3, 187 L.Ed.2d 341 (2013) (summary reversal); Reichle v. Howards, — U.S. —, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012); Rybum v. Huff, — U.S. —, 132 S.Ct. 987, 181 L.Ed.2d 966 (2012) (summary reversal); Messerschmidt v. Millender, — U.S. —, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012); Ashcroft v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011),
In my view, the panel opinion in this case contravenes those emphatic Supreme Court directives. Two D.C. police officers have been held liable for a total of almost $1 million. That equates to about 20 years of after—tax income for the officers, not to mention the harm to their careers.[1] For what? For arresting for trespassing, a group of people who were partying late at night with drugs and strippers in a vacant house that the partiers did. not own or rent. To be. sure, the partiers claimed that they had permission from a woman named Peaches to use the vacant house. But the officers soon learned that Peaches herself did not have permission to use the house. And the officers reasonably could have thought'that the partiers probably knew as much. Therefore, the officers reasonably could have concluded that there was probable cause to arrest the partiers for trespassing. The officers were not “plainly incompetent” and did not “knowingly violate” clearly established law when they made these arrests. The officers are entitled to qualified immunity.
The Supreme Court has reminded us that qualified immunity is important “to society as a whole.” Sheehan, 135 S.Ct. at 1774 n. 3 (internal quotation marks omitted). That holds true in this case. The Attorney General for the District of Columbia has filed a vigorous petition for rehearing en banc. The Attorney General’s petition convincingly explains how the panel opinion will negatively affect the ability of D.C. police officers to make the on-the-spot credibility judgments that are essential for officers to perform their dan *103 gerous jobs and protect the public. I would grant the Attorney General’s petition.
Responding to this dissent, the panel majority says that it agrees with this dissent about the law and that our disagreement with one another is simply about how the law applies to the facts. But that is true in most qualified immunity cases. At a high enough level of generality, the law of qualified immunity is settled, as are the relevant Fourth Amendment principles. But what has concerned the Supreme Court in numerous cases is how lower courts apply the general'qualified immunity and Fourth Amendment principles to the facts of particular cases.[2] That is my concern here as well.
I
At about 1:00 a.m. on March 16, 2008, the District of Columbia’s Metropolitan Police Department received a complaint about loud music and possible illegal activity at a house east of the Anacostia River between Benning Road and East Capitol Street, a short distance northeast of RFK Stadium. According to the caller, the house where the party was taking' place had been “vacant for several months.” Metropolitan Police Department Arrest/Prosecution Report, reprinted in Joint Appendix (“J.A.”) 73.
Police officers quickly responded to the scene. The officers heard music coming from inside the house. After knocking bn the door and entering, the officers observed that the house was sparsely furnished and “in. disarray,” consistent “with it being a vacant property.” Id. In the hving..room, they, saw a large group of people engaged in. behavior consistent “with activity, being conducted in strip clubs for profit.” Id. Several women were “dressed only in their bra and thong with money hanging out” of “their, garter belts,” Officer Khan Interrogatory, J.A. 163, The officers smelled marijuana. When the officers entered, the partiers initially scattered into other rooms.
The officers talked to everyone present in the house. The 21 people who were there told the officers conflicting stories about what they were doing on the property. Some said' they were celebrating a birthday party. Most said it was a bachelor party. But the guest of honor was not identified to the officers.
The people in the house also gave conflicting stories about who had supposedly given them permission to use the house. No one could identify the. owner of the house- Several people said that they had been invited by other people. Some said that a woman known as “Peaches” • or “Tasty” had given the partiers permission to use the house. But Peaches was -not present at the house.
Notwithstanding the conflicting stories and suspicious circumstances, the officers did not immediately arrest the partiers for trespassing. Rather, the officers took time to further investigate the situation. The officers contacted both Peaches and the owner, of the house. They reached *104 Peaches by phone. The officers thought that Peaches was evasive. Peaches said that she had given the partiers permission to use the house. But when the officers asked who in turn had given Peaches authority to use the house, Peaches responded that she was- “possibly renting the house from the owner,” who was “fixing the house up for her.” Wesby v. District of Columbia, 841 F.Supp.2d 20, 25-26 (D.D.C.2012) (Deposition of Sergeant Sú-ber). When pressed by the officers, Peaches finally admitted that she did not have authority to use the house. She refused to come to the. house because she said that she would be arrested. She hung up the phone on the officers.
The officers then called the owner of the house, Mr. Hughes. • Mr. Hughes told the police officers that no one—including Peaches—had authority to use the house.
After they had assessed the scene, talked to the partiers, and gathered information from Peaches' and Mr. Hughes, the police officers arrested the people in the house for trespassing, an offense known as “unlawful entry” under D.C. law. Trespassing is a minor offense under D.C. law.[3] Prosecutors later decided not to pursue charges against the partiers.'
After all of the charges arising out of the incident had been dropped, many of the 21 people who had been arrested turned around and sued the police officers and the District of Columbia under Section 1988 and D.C. law. The plaintiffs claimed that the officers - had made the arrests without probable cause. The officers countered that they had probable cause to arrest the plaintiffs -for .trespassing. The officers also asserted that, in any event, they were entitled to qualified immunity for tw;o distinct- reasons. First, it was at least reasonable.for the officers to believe that they had probable cause to arrest under these factual circumstances. And second, the officers did not contravene any clearly established law by making these arrests for trespassing.
On cross motions for summary judgment, the District. Court concluded that the officers did not have probable cause to arrest and, moreover, were not entitled to qualified immunity. The District Court granted summary judgment to the plaintiffs. After a trial on damages, a jury awarded the plaintiffs $680,000. Attorney’s fees brought the total award to almost $1 million. The police officers and the District of. Columbia are jointly and severally liable for that total.[4]
*105 The District of Columbia and the police officers appealed to this Court. A panel of this Court affirmed the judgment of the District Court. The panel opinion concluded that the police officers did not have probable cause to arrest the plaintiffs and were not entitled to- qualified immunity. Judge Brown dissented. The District of Columbia and the police officers sought rehearing en banc. ' I would grant en banc review.
II
The police officers persuasively argue that they had probable cause to arrest the partiers for trespassing. But regardless of whether the officers had probable cause, they are entitled to qualified immunity because they at least reasonably could have believed that they had probable cause. Could the officers have walked away from the vacant house filled with partiers? Sure. Could they have broken up the party and then left? No doubt. Indeed, in retrospect, that might well have been a better decision. But did the officers act in a “plainly incompetent” mahner or “knowingly violate” clearly established law by making these arrests for trespassing? No.
To begin with, the probable cause standard itself gives police officers substantial leeway when determining whether to make an arrest. As the Supreme Court has explained, probable cause is a “fluid concept” that turns on “factual and practical considerations of everyday lifé on which reasonable and prudent” persons, “not legal technicians, act.” Illinois v. Gates, 462 U.S. 213, 231-32, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (internal quotation marks omitted). Probable cause is “not readily, or even usefully, reduced to a neat set of legal rules.” Id. at 232, 103 S.Ct. 2317. To have probable cause to arrest, a police officer does not need proof beyond a reasonable doubt, or even by a preponderance of the evidence, that an individual committed a crime. As the Supreme Court has emphasized: “Finely tuned standards such as proof beyond -a reasonable doubt or by a preponderance of the evidence” have “no place in the [probable-cause] decision.” Florida v. Harris, — U.S. —, 133 S.Ct. 1050, 1055, 185 L.Ed.2d 61, slip op. at 5 (2013) (alteration in original) (internal quotation marks omitted).
In damages • suits against' officers, the doctrine of qualified immunity adds an extra dose of judicial deference to oúr review of the officer’s probable cause determination. As a general matter, qualified immunity “gives government officials breathing room to make reasonable but mistaken judgments” and “protects all but the plainly incompetent .or those who knowingly violate the law.” Carroll v. Carman, — U.S. —, 135 S.Ct. 348, 350, 190 L.Ed.2d 311 (2014) (internal quotation marks omitted). The “crucial question” is “whether the official acted reasonably in the particular circumstances that he or,she faced.” Plumhoff v. Rickard, — U.S. —, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014).
In applying the qualified immunity doctrine to the, issue of probable cause to make arrests, the Supreme Court has said that officers “who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.” Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991), (internal quotation marks omitted); see also Wardlaw v. Pickett, 1 F.3d 1297, 1304 (D.C.Cir.1993). In accord with that Supreme Court precedent, most courts of appeals—including our Court—have ruled that officers may not be held liable for damages for allegedly wrongful arrests so long as they had *106 “arguable probable cause” to make the arrest. See, e.g., Moore v. Hartman, 644 F.3d 415, 422 (D.C.Cir.2011), vacated on other grounds, — U.S. —, 132 S.Ct. 2740, 183 L.Ed.2d 612 (2012); Cox v. Hainey, 391 F.3d 25, 33 (1st Cir.2004); Garcia v. Jane & John Does 1-40, 779 F.3d 84, 92 (2d Cir.2015); Club Retro, L.L.C. v. Hilton, 568 F.3d 181, 207 (5th Cir.2009); Greene v. Barber, 310 F.3d 889, 898 n. 2 (6th Cir.2002); McComas v. Brickley, 673 F.3d 722, 725 (7th Cir.2012); Ulrich v. Pope County, 715 F.3d 1054, 1059 (8th Cir.2013); Blankenhorn v. City of Orange, 485 F.3d 463, 475 (9th Cir.2007); Stonecipher v. Valles, 759 F.3d 1134, 1141 (10th Cir.2014); Morris v. Town of Lexington Alabama, 748 F.3d 1316, 1324 (11th Cir. 2014).
Therefore, in suits alleging a lack of probable cause to arrest, officers are not liable if they arguably had probable cause—that is, if the officer reasonably could halve believed that there was probable cause to arrest.
As a result, the qualified immunity question in this case is not whether the officers had probable cause to arrest the partiers at the house. , Rather, the question is whether the officers reasonably could have believed that they had probable cause to arrest for trespassing a group of people who were having "a party late at night with strippers and drugs in a vacant house that none of the partiers owned, or rented, notwithstanding the partiers’ claims that they had permission from a woman named Peaches to use the house.
The qualified immunity question in this case, is readily answered by a few basic principles of criminal law and procedure. Under D.C. law, it is unlawful to enter private property without permission from the owner or renter, or without other lawful authority. See Ortberg v. United States, 81 A.3d 303, 306-07 (D.C.2013). It is undisputed that the partiers were on private property without permission from an owner or renter, and without other lawful authority. Therefore, this is a .case where the actus reus of the crime was complete. The sole issue from the perspective of a reasonable police officer was whether the partiers had the necessary mens rea to commit the crime of trespassing. If the partiers believed that-they had permission from a lawful owner or renter to use the house, then the partiers did not commit the offense of trespassing under D.C. law, See id. at 308-09.
The only question in this case, then, is whether the officers could reasonably disbelieve the partiers when the partiers said that they thought they had permission to use the house.
In a case like this where the actus reus is complete and the sole issue is the defendant’s mens rea, police officers often must make credibility assessments on the spot, sometimes in difficult circumstances.. In those situations, are police officers always required to believe the statements of the suspects—in this case, the partiers in the house? Of- course not. Yet the panel opinion seems to say yes, at least for this kind of case. According to the panel opinion, “in the absence of any conflicting information,” a police officer does.not have probable cause to arrest people for trespassing if those people claim that they were invited by “someone with apparent (if illusory) authority.” Wesby v. District of Columbia, 765 F.3d 13, 21 (D.C.Cir.2014). And under the panel’s approach, even if a reasonable police officer could have doubted the credibility of the people claiming to have been invited to the house, those credibility doubts do not count as “conflicting information.” See id.
The panel opinion’s approach is not and has never been the law. When police officers confront a situation in which people *107 appear to be engaged in unlawful activity, the officers often hear a variety of mens rea-related excuses. “The drugs in my locker aren’t mine.” “I don’t know how the loaded gun got under my seat.” “I didn’t realize the under-aged high school kids in my basement had a keg.” “I wasn’t looking at child pornography on my computer, I was hacked.” “I don’t know how the stolen money got in my trunk.” “I didn’t see the red light.” “I punched my girlfriend in self-defense.”
But in the heat of the moment, police officers are entitled to make reasonable credibility judgments and to disbelieve protests of innocence from, for example, those holding a smoking gun, or driving a car with a stash of drugs under the seat, or partying late at night with strippers and drugs in a vacant house without the owner or renter present: ' As Judge Brown' said, the law does not require officers “to credit the statement of the intruders regarding their own purportedly innocent mental state where the surrounding facts and circumstances cast doubt on the veracity of such claims.” Wesby, 765 F.3d at 36 (Brown, J., dissenting). And as the Second Circuit recently stated: A police officer is required to accept a suspect’s mens rea-related defense only if, among other things, “the facts establishing that defense were so' clearly apparent to the officers on the scene as a matter of fact, that any reasonable officer would have appreciated that there was no legal basis for arresting plaintiffs.” Garcia, 779 F.3d at 93.
Almost every court of appeals has recognized that officers "cannot be expected to definitively resolve difficult mens rea questions in the few moments in which officers have to decide whether to make an arrest. Consider the following sample:
• “Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.” Amobi v. D.C. Department of Corrections, 755 F.3d 980, 990 (D.C.Cir.2014) (internal quotation marks omitted).
• The “practical restraints on police in the field are greater with respect to ascertaining intent and, therefore, the latitude accorded to officers considering the probable .cause issue in the • context of mens rea crimes must be correspondingly great.”, Cox v. Hainey, 391 F.3d 25, 34 (1st Cir.2004). “It is up to the factfinder to determine whether a defendant’s story holds water, not the arresting officer — Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury: Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence.” Krause v. Bennett, 887 F.2d 362, 372 (2d Cir.1989).
• “Absent a confession, the officer con-sidering the probable cause issue in the context of crime requiring a mens rea on the part of the suspect will always be required to rely on circumstantial evidence reghrding the state of his or her mind.” Paff v. Kaltenbach, 204 F.3d 425, 437 (3d Cir.2000).
• “The probable cause inquiry looks to the totality of the circumstances; the standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate.” Wright v. City of Philadelphia, 409 F.3d 595, 603 (3d Cir.2005).
• In “considering the totality of the circumstances,” a defendant’s “innocent explanations for his odd behavior cannot eliminate the suspicious facts from *108 the probable cause calculus.” Sennett v. United States, 667 F.3d 531, 536 (4th Cir.2012) (internal quotation marks omitted).
• An investigator’s “failure to make a further investigation into the suspect’s state of mind does not constitute lack of probable cause if all objective elements of a crime reasonably appear to have been completed.” Brown v. Nationsbánk Corp., 188 F.3d 579, 586 (5th Cir.1999) (internal quotation marks omitted).
• Police are “under no obligation to give any credence to a suspect’s story ... if the facts as initially discovered provide probable cause.” Ahlers v. Schebil, 188 F.3d 365, 371 (6th Cir.1999) (internal quotation marks omitted).
• “Many putative defendants protest • their innocence, and it is not the responsibility of law enforcement officials to test such claims once probable cause has been established.” Spiegel v. Cortese, 196 F.3d 717, 724 (7th Cir. 1999).
• “When an officer is faced with conflicting information that cannot be immediately resolved,” the officer “need not rely on an explanation given by the suspect” and “may have arguable . probable cause to arrest a suspect.” Royster v. Nichols, 698 F.3d 681, 688 (8th Cir.2012) (internal quotation marks omitted).
• “Rarely will a suspect fail to proffer an innocent explanation for his suspicious behavior. The test is not whether the conduct under' question is consistent with- innocent behavior; law enforcement officers do not have to rule out the possibility of innocent behavior.” Ramirez v. City of Buena Park, 560 F.3d 1012, 1024 (9th Cir.2009) (internal quotation marks omitted).
• The police officers “were hot required” to forgo arresting the defendant “based on initially discovered facts showing probable cause simply because” the defendant “offered a different explanation.” Marx v. Gunbinner, 905 F.2d 1503, 1507 n. 6 (11th Cir.1990).
Here, in the brief time in which the officers had to decide whether to make arrests, they could not definitively resolve the difficult question of the partiers’ mens rea. Mr. Hughes, the owner of the house, told the police officers that no one had authority to use the house. At the same time, Peaches told the officers that she had given the partiers permission to use the house. But there were holes in Peaches’s story.
Under these circumstances, a reasonable officer could interpret the situation in at least three different ways. First, even, if Peaches “invited” the partiers to use the house, maybe the partiers still knew that Peaches did not really have lawful authority to use the vacant house. In other words, maybe the partiers were not unwittingly duped by Peaches but instead knew or suspected that Peaches was not renting the house and did not have authority to invite the partiers there. Second, maybe the partiers were lying when they said that Peaches had given them permission to use the house, and maybe Peaches then played along and supplied cover for her friends when the officers reached her on the phone. (Did someone from the party text Peaches first to give her a heads-up? Who knows.) Third, maybe the partiers were telling the whole truth and were unwittingly misled by Peaches into thinking that she had authority over the house.
In the first two scenarios, a reasonable officer would have probable'cause to arrest the partiers for trespassing. In the third *109 scenario, a reasonable officer would not have probable cause to arrest.
But at the time of the arrests, the officers did not have a way to rule out either of the first two scenarios. After all, a police officer is required to accept a suspect’s mens rea-related defense only if, among other things, “the facts establishing that defense were so clearly apparent to the officers on the scene as á matter of fact, that any reasonable officer would have appreciated that there- was no legal basis for arresting plaintiffs.” Garcia, 779 F.3d at 93. In this case, the officers had several reasons to doubt that the partiers were telling the truth when they claimed that Peaches had given them permission to use the house. The partiers were in a vacant house late at night without the owner or renter present. The partiers gave conflicting explanations for what they were doing at the house, and about who had supposedly given them permission to be there. The police officers also had several reasons to doubt that Peaches was telling the truth. When the officers contacted Peaches, she refused to come to the house because she said she would be arrested, and she gave conflicting accounts of her authority over the house.
Of course, maybe further investigation would ultimately establish that the' third scenario was in fact what had happened. Maybe the partiers had been unwittingly misled by Peaches into thinking that she had authority over the house. But that was not the only reasonable interpretation of the situation at the time of the arrests. And once “a police officer has a reasonable basis for believing there is-probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.” Amobi, 755 F.3d at 990 (internal quotation marks omitted).
In short, the officers were required to make an on-the-spot credibility determination in a situation far removed from the serenity and unhurried decision making of an appellate judge’s chambers. Under the circumstances, it was entirely reasonable for the officers tó have doubts about the partiers’ story and to conclude that there was probable cause to arrest the partiers for trespassing, The police officers are entitled-to qualified immunity.[5]
Ill
The police officers are also entitled to qualified immunity for a second, independent reason. At the' time the officers made the arrests here, the arrests violated no clearly established statutory or constitutional right. Any such right was created by the panel opinion in this case—years after the officers made the arrests.
The Supreme Court has stated many times that officers are entitled to qualified immunity uiiless a plaintiff can show that “the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.” Plumhoff v. Rickard, — U.S. —, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014) *110 (internal quotation marks omitted)? see also Taylor v. Barkes, — U.S. —, 135 S.Ct. 2042, 2044, 192 L.Ed.2d 78 (2015) (summary reversal); City & County of San Francisco v. Sheehan, — U.S. —, 135 S.Ct. 1765, 1774, 191 L.Ed.2d 856 (2015); Carroll v. Carman, — U.S. —, 135 S.Ct. 348, 350, 190 L.Ed.2d 311 (2014) (summary reversal); Wood v. Moss, — U.S. —, 134 S.Ct. 2056, 2061, 188 L.Ed.2d 1039 (2014); Stanton v. Sims, — U.S. —, 134 S.Ct. 3, 4, 187 L.Ed.2d 341 (2013) (summary reversal); Reichle v. Howards, — U.S. —, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012); Ashcroft, v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011).
“To be clearly established* a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.” Taylor, 135 S.Ct. at 2044 (internal quotation marks omitted). The Supreme Court has emphasized that courts must “define the clearly established right at .issue on the basis of the specific context of the case.” Tolan v. Cotton, — U.S. —, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)) (internal quotation marks omitted). The Court has “repeatedly told courts ... not to define clearly established law at a high level of generality.” al-Kidd, 131 S.Ct. at 2084. “Qualified immunity is no immunity at all if clearly established law can simply be defined” at a high level of generality. Sheehan, 135 S.Ct. at 1776 (internal quotation marks omitted).
That longstanding rule is one manifestation of the law’s general concern about retroactive punishment or liability. See generally Landgraf v. USI Film Products, 511 U.S. 244, 265-67, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). It would be unfair for a court to impose monetary liability on a police officer by creating a new legal rule and then applying that new rule retroactively to punish the officer’s conduct. Without “fair notice, an officer is entitled to qualified immunity.” Sheehan, 135 S.Ct. at 1777 '(internal quotation marks omitted). Because “the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer’s conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.” Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004); see also Taylor, 135 S.Ct. at 2045 (clearly established precedent must put officials “on notice of any possible constitutional violation”); Plumhoff, 134 S.Ct. at 2023 . (“We did not consider later decided cases” when determining whether an officer violated clearly established law because those cases “ ‘could not have given fair notice’ ” to the officer.).
At the time of the arrests here, no case had said that officers are required to believe the statements of suspected trespassers who claim that they have permission to be on the property. On the contrary, as explained above, it was and is settled law that officers do not automatically have, to believe a suspect’s excuses when the officers catch the suspect in the midst of an activity that otherwise appears to be illegal. And in the trespassing context in particular, the most relevant D.C. trespassing cases supported arrest in this kind of case. See Artisst v. United States, 554 A.2d 327, 330 n. 1 (D.C.1989); McGloin v. United States, 232 A.2d 90, 91 (D.C.1967).
In Artisst v. United States, for example, the defendant argued that the evidence was not sufficient for a jury to convict him for trespassing in a Georgetown University *111 dorm. 554 A.2d at 329. Artisst claimed that he had entered the building to buy soccer equipment from a dorm resident and that he therefore lacked the necessary intent to commit unlawful -entry. Id. The D.C. Court of Appeals upheld the conviction, finding that a jury could disbelieve Artisst’s explanation. See id. at 330 n. 1. But under the panel opinion here, the police presumably, could not even have arrested Artisst, much less a jury have convicted him.
Similarly, in McGloin v. United States, the defendant challenged his conviction for trespassing in an apartment building. 232 A.2d at 90. McGloin told the arresting officer that he had entered the building to look for his cat. Id. McGloin later told the same officer that he had entered the building to look for a friend. Id. The D.C. Court of Appeals upheld McGloin’s conviction, noting that although “one who enters for a good purpose and with a bona fide belief of his right to enter is not guilty” of trespassing, this “is not such a case.” Id. at 91. But again, under the panel opinion here, the police presumably could not even have arrested McGloin, mueh less a jury have convicted him.
The panel opinion sweeps that D.C. Court of Appeals case law under the rug. The panel opinion does not analyze Artisst, and it distinguishes McGloin as “merely” recognizing that under certain circumstances, it is “reasonable to infer an interloper’s intent to enter against the will of the owner.” Wesby v. District of Columbia, 765 F.3d 13, 22 (D.C.Cir.2014).
But the D.C. Court of Appeals cáse law is on point. In my opinion, that case law clearly permits police officers to arrest a person for trespassing even when that person claims to have the right to be on the property, if a reasonable officer could disbelieve the suspected trespasser. If juries in trespassing cases can refuse to credit defendants’ explanations for their unlawful presence in buildings, police officers surely can do the same. After, all, the standard of proof for convictions is beyond a reasonable doubt, but the standard for an arrest is the far lesser showing of probable cause. See Florida v. Harris, — U.S. —, 133 S.Ct. 1050, 1055, 185 L.Ed.2d 61 (2013).
But even apart from those D.C. Court of Appeals decisions, one thing is crystal clear: No decision prior to the panel opinion here had prohibited arrest under D.C. law in these circumstances. This should have been a fairly easy case for qualified immunity. Instead, the panel opinion did what the Supreme Court has repeatedly told us not to do: The panel opinion created a new rule and then applied that new rule retroactively against the police officers. The panel opinion held that “in the absence of any conflicting information,” officers do not have probable cause to arrest people for trespassing if those people claim that they were invited by “someone with apparent (if illusory) authority.” Wesby, 765 F.3d at 21. On top of that, the panel opinion added a dubious gloss to its novel rule: Even if a reasonable police officer could have doubted the credibility of the trespassers who claimed to be invitees, those credibility doubts do not count as “conflicting information.” What case had ever articulated such a counterintuitive rule? Crickets.
Whatever the merits of the panel opinion’s new rule—and I think it is divorced from the real world that police officers face on a regular basis—it is still a new rule. And as the Supreme Court has shouted from its First Street rooftop for several years now, qualified immunity protects officers from personal liability for violating rules that did not exist at the time of the officers’ actions. See, e.g., Sheehan, 135 S.Ct. at 1777; Plumhoff, 134 *112 S.Ct. at 2023; Stanton, 134 S.Ct. at 7.[6] The police officers in this case did not violate clearly established law when they arrested the partiers. The officers are entitled to qualified immunity.[7]
* * *
The qualified immunity doctrine affords police officers room to make reasonable judgments about whether they have probable cause to make arrests. The Supreme Court has emphasized that the doctrine protects all but the plainly incompetent or those who knowingly violate clearly established law. The officers in this case were not plainly incompetent, nor did they knowingly violate clearly established law. Anything but. Even if the officers ultimately were wrong in concluding that they had probable cause (and I do not think they were wrong), it was at least reasonable for the officers to believe that they had probable cause under the circumstances and applicable law. They should not be subject to $1 million in damages and fees for their on-the-spot decision to make these trespassing arrests. To be sure, I do not dismiss' the irritation and anguish, as well as thé' reputational and economic harm, that can come from being arrested. Police officers should never lightly take that step, and the courts should not hesitate to impose liability when officers act unreasonably in light of clearly established law. But that is not what happened here, not by a long shot. I respect *113 fully dissent from this Court’s decision not to rehear this case en banc.

. As the Supreme Court has said: "Whatever contractual obligations” the District of Columbia "may (or may not) have to represent and indemnify the officers are not our concern. At a minimum, these officers have a personal interest in the correctness of the judgment below, which holds that they may have violated the Constitution.” Sheehan, 135 S.Ct, at 1774 n. 3. Deposition of Officer Campanale, J.A. 124,

. In similar en banc circumstances, another court of appeals recently reconsidered a panel opinion, about qualified immunity in a false arrest case. In Garcia v. Jane & John Does 1-40, 779 F.3d 84 (2d Cir.2015), Judge Calabre-si and Judge Lynch, over the dissent of Judge Livingston, originally denied the officers’ qualified immunity motion. After the officers filed a strongly worded petition for rehearing en banc, the three-judge panel unanimously issued an amended opinion holding that the police officers were entitled to qualified immunity. See id. at 87. Many of the issues in that Second Circuit case resemble the issues in this case. I respectfully suggest that, similar re-examination of the original- panel opinion would have been warranted here.

. Under D;C. law, trespassing is punishable by a maximum jail sentence of 180 days and a maximum fíne of $1,000. D.C.Code.;§ 2-2-3302.

. For purposes of Section 1983 liability,-the District of Columbia is considered a municipality. See People for the Ethical Treatment of Animals v. Gittens, 396 F.3d 416, 425 (D.C.Cir.2005). As a municipality, the District of Columbia “cannot be held liable solely because it employs a tortfeasor—or, in other words,- a municipality cannot be held liable under § 1983 on a respondeat superior theory." Singletary v. District of Columbia, 766 F.3d 66, 72 (D.C.Cir.2014) (quoting Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)) (internal quotation marks omitted). The District of Columbia may be held liable under Section 1983 only when the execution- of a government "policy or custom” inflicts an injury for which the District of Columbia "as an entity is responsible under § 1983.” Id. (quoting Monell, 436 U.S. at 694, 98 S.Ct. 2018) (internal quotation marks omitted).
In this case, the plaintiffs did not allege that a government policy or custom led to the arrests. Because respondeat superior is not a theory of liability in Section 1983 cases against municipalities, the District of Columbia was therefore not liable for the Section 1983 claims. The District of Columbia instead was liable for the D.C. law claims. The damages award was not apportioned between the Section 1983 and D.C. law claims. The *105 District of Columbia and the two officers are jointly and severally liable for the full amount.

. Qualified immunity examines whether police officers’ actions are “objectively reasonable,” not whether police officers subjectively believe that their actions are reasonable. Moore, 644 F.3d at 423 n. 7 (emphasis added) (quoting Wardlaw, 1 F.3d at 1305) (internal quotation marks omitted). The District Court’s opinion noted that a few of the police officers at the scene "erroneously 'believed that the question of whether Plaintiffs had been invited onto the property was irrelevant.” Wesby v. District of Columbia, 841 F.Supp.2d 20, 38 n. 15 (D.D.C.2012). The panel majority’s concurrence in the denial of rehearing en banc similarly highlights the officers’ subjective beliefs. . Concurrence 97, 100-01 & n.l. But because qualified immunity is an objective inquiry, an officer’s subjective belief about the law is not relevant to the qualified immunity issue.

. To be sure, "in an obvious case," general constitutional principles "can clearly establish the answer, even without a body of relevant case law.” Brosseau, 543 U.S, at 199, 125 S.Ct. 596 (internal quotation marks omitted). For example, the Supreme Court concluded that handcuffing a prison inmate to a hitching post for seven hours in the sun and without water was an "obvious” violation of the Eighth Amendment’s prohibition on cruel and unusual punishment. Hope v. Pelzer, 536 U.S. 730, 738, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). But the case before us now is hardly an "obvious” case of unconstitutionality. Arresting partiers late at night in a vacant house for trespassing when police officers could reasonably doubt that the parti-ers had authority to use the house is far from an "obvious” violation of constitutional rights by police officers.

. The plaintiffs brought suit against the police officers not only under Section 1983 but also under D.C. law.. Under D.C. law, a police officer is not liable for the tort of false arrest if the police officer .had probable cause to ' make the arrest, or "if the officer can demonstrate that (1) he or she believed, in good faith, that his [or her] conduct was lawful, and (2) this belief was reasonable.” Bradshaw v. District of Columbia, 43 A.3d 318, 323 (D.C.2012) (alteration in original) (internal quotation marks omitted). Under D.C. law, then, a police officer is entitled to immunity from a false arrest suit if the officer both (i) reasonably could have believed that there was probable cause to arrest and (ii) subjectively believed in good faith that there was probable cause to arrest. As the D.C. Court of Appeals has held, that "standard resembles the section 1983 probable cause and qualified immunity standards,” with "the added clear articulation of the requirement of good faith.” District of Columbia v. Minor, 740 A.2d 523, 531 (D.C. 1999).
This opinion has analyzed the objective aspect of the standard. . As to the subjectivaspect, the two defendant police officers in this case, Officers Parker and Campanale, believed in good faith that they had 'probable cause to make the arrests because the officers were unable to definitively determine if the partiers were telling the truth when they claimed to have permission to use the house. Officer Parker indicated that the officers made the arrests because "one person said” that the partiers "didn’t have the right” to use the house, and "one person said” that the partiers "did have the right” to use the house. Deposition of Officer Parker, J.A. 99. Officer Campanale similarly stated that the officers arrested the partiers because "[njobody could determine who was supposed to be inside the residence,” and because the partiers were "present inside of a location that” the partiers did "not have permission to be in.” Deposition of Officer Campanale, J.A. 124.